ROBERT TEMPLE *vs.* ABNER MEAD.

RUTLAND,
*February,*
1832.

Under the constitution of this state, *printed* votes may be legally received for Governor, Lieutenant Governor, Treasurer and Councillors, who are to be chosen annually by the freemen.

This was an action on the case brought by the plaintiff against the defendant for refusing to receive a printed vote, on which there was a judgement for the plaintiff by consent in the county court ; and it was agreed that the case should pass to the Supreme Court, for final judgement on the following case stated :—

" The plaintiff, a freeman and legal voter in the town of Rutland, and state of Vermont, at a Freeman's meeting duly warned and holden at Rutland, on the first Tuesday of September, A. D. 1830, for the purpose of electing a Governor, Lieutenant Governor, Treasurer of the state, and Councillors, for the year ensuing, offered to the defendant, (within the time required by law,) the presiding officer in said meeting, his vote for Governor, Lt. Governor, Treasurer of the state, and Councillors, on a piece of paper, on which were legibly *printed* the names of the following persons, Samuel C. Crafts, for Governor, Mark Richards, for Lt. Governor, Benjamin Swan, for Treasurer ; for Counsellors, Myron Clark, Samuel Clark, Robert Pierpont, Thomas D. Hammond, William G. Hunter, Ezra Hoyt, Jedediah .H Harris, John C. Thompson, George Worthington, Benjamin F. Demming, James Davis and Ira H. Allen ; and the defendant refused to receive, and did reject, said vote, assigning for a reason, that the names of the candidates were printed ; and refused to receive the same for that, and for no other reason. If the defendant erred in not receiving said vote, for the cause assigned, then the judgement of the county court is to be affirmed ; otherwise, to be reversed.

*Royce and Hodges, for defendant.*—The propriety and expediency of permitting printed votes to be substituted for written ones, forms no part of the present discussion ; for if it is established that the framers of the constitution used the word understandingly, the danger, and even criminality, of defeating their intentions by a judicial decision, must be too apparent to need its being urged before this tribunal. To suppose that the framers of our constitution used the word " written," without fully comprehending its meaning, is casting an imputation upon their knowledge of language which illy coincides with the wisdom displayed in framing it. If at the time the present constitution was adopted, printing presses had not been established in this, and surrounding

RUTLAND,
February,
1832.

Temple
vs.
Mead.

states, there might be some foundation for supposing that the word was not used in its most common acceptation ; but the fact that it was so, is conclusive evidence that they either feared the influence which might be exerted by the press, or that they considered the expression of the public mind more clearly indicated by having every freeman who went to the polls, put in the vote in his own hand writing. It is not denied that when a word is used known to the common law, that a reference must be had to its meaning as ascertained by judicial decisions ; but this rule does not apply to words in common use, and where the meaning is obvious to every one. The practice, under the present constitution, of every freeman in the state, is most conclusive to prove, that the language of the constitution has been literally understood, and no one has pretended to doubt its meaning, although its expediency has been, and still may be, doubted.

*Mr. Ormsbee for the plaintiff.*—By the constitution the freemen of this state are required to bring in their votes for Governor, with his name fairly written.—*Comp. Stat. p.* 46, *sec.* 10. It seems also to be contemplated that the Lieut. Governor, Treasurer, and Councillors, shall be voted for in the same manner. The question intended to be raised in the present case is, whether a vote, on which the names of the persons voted for are fairly and legibly printed, comes within the provisions of the constitution. It is a general rule of construction, as applied to statutes, (and no reason is seen why it should not apply in the present case,) that the intention of the makers of a statute is to be pursued in its construction; and this is best inferred from the cause, necessity, and object of such statute. To ascertain the persons voted for by such freeman, by having the name of each person voted for fairly and legibly written upon the vote, it is believed was the intention of the framers of the constitution in inserting this provision. Public policy and individual convenience both would seem to require that this designation of the individual voted for, might be made in any manner which would, with the greatest facility, and with sufficient certainty, express the intention of the voter, while it should not be unduly burdensome to the several officers whose duty it is made to receive the votes and transmit them to the place where they are counted. The constitution merely requires that the name of the person voted for should be fairly written. Had the persons, who inserted this provision in the constitution, wished to effect any thing more by it than merely to require that the voter

Rutland,
February,
1832.

Temple
vs.
Mead.

should designate the person he voted for by his name fairly written, (that is, fairly expressed in letters) they would unquestionably have prescribed the manner in which the name should be written, the material upon which it should be written, and the instrument with which the characters should be traced. Upon all these points the constitution is silent, and leaves them to be fixed by custom, by judicial and legislative construction, and by the application of sound common sense. A freeman might,within the the strict letter of the constitution, offer his vote written upon a table of lead, or a mass of marble, or upon any other material equally cumbersome and inconvenient ; but no one would for a moment maintain that the proper officer would be bound either to receive, or transmit, such a vote. Neither could there have been the slightest doubt upon this subject in such an extreme case, even if the legislature had not made provision that the names of the persons voted for should be written upon *paper*, though there might have been as to many other substances.—See *Comp. Stat. p.* 572. It is matter of public policy, that every safe facility should be given for furnishing the freemen of the state with votes ; and, aside from the convenience of printed votes, they are a great safeguard against imposing upon ignorant and careless voters, by means of names purposely written with the pen, so as to be nearly illegible, and entirely so to those not accustomed to decypher blind, blurred, or blotted penmanship.

2nd. When a statute makes use of a word the meaning of which is known to the common law, the word shall be understood in the same sense.—6 *Mod.* 143. No reason is seen why this rule should not apply in the present case. By the common law a deed consists of three parts, writing, sealing, and delivery. A deed is defined to be a *writing*, sealed and delivered by the parties.—3 *Jac. L. Dict.* 215 ; 1 *Inst.* 171. This definition is adopted by *Blackstone*, 2 *Com.* 295. It is believed to have been the uniform course of courts, both in England and this country, to consider printing, in deeds and in other contracts, as equivalent to writing ; in other words, to consider printing as being included in, and merely a variety of ,writing. A deed must be written, or, (as is the case at present with many instruments, such as bonds, policies of insurance, &c.,) *printed.—Co. Lit.* 229. A deed may be written in any hand, as in text, court, or Roman hand.—2 *Co.* 3 ; 2 *Bl. Com.* 297. Among the requisites of a good deed, writing is enumerated.—2 *Bl. Com.* 308. By statute it is required that all leases, estates, interests of freehold or term of years, crea-

68

RUTLAND,
*February*,
1832.

Temple
*vs.*
Mead.

ted by livery and seizin only, or by parol, and not in writing, shall have the force and effect of estates at will only. All assignments and contracts for the sale of land are also required to be in writing. That in all these cases printing should have been considered as equivalent to, or rather included in, writing, seems to have fixed the meaning of the word beyond reasonable question, both by legislative use, and judicial construction.

3dly. It is contended that the use of the word "*written*," in the English language, as meaning simply, that what is written is " *expressed in letters*," without regard to the manner in, or the instrument with, which those letters are formed, is a use of the word well warranted both by the common practice and acceptation of mankind, by the example of the learned and skilful in language, and by the uniform current of definitions in the most approved lexicographers. By turning to the definitions in *Webster* and *Johnson*, of the word *written*, from the verb *to write*, and of the substantive, *writing*, and comparing them with the definitions of *printing* and *printed*, it will be found, that *printed* is the being indented or impressed with letters or characters; that *printing* is impressing letters or characters or figures, on paper, cloth, or other material; that *to write*, is to express by forming letters and words on paper or stone, as to write a deed; that *to write*, is also the act of forming characters, letters and figures, as the representatives of ideas ; that writing is the act or art of forming letters and characters on paper, wood, stone, or other material, for the purpose of recording the ideas which words and characters express, or of communicating them to others by visible signs. It is contended, therefore, by the plaintiff in this case, that what the framers of the constitution intended by being fairly written, was the being fairly and legibly expressed in letters. To suppose otherwise would be to suppose that they intended to use the word in its restricted, instead of its general, acceptation, in a sense contrary to its well known legal signification ; and finally, to give it a meaning which would be injurious and inconvenient, when, with more propriety, they might give it a meaning which would be convenient for the individual and beneficial to the public.

The opinion of the Court was delivered by

WILLIAMS, J.—At the freemen's meeting which was held in Rutland, in September, A. D. 1830, the plaintiff offered to the defendant, who was first constable of the town, and presiding officer of said meeting, his vote, on which were legibly printed the

names of the persons he intended to vote for, as Governor, Lieut. Governor, Treasurer and Councillors, designating the offices intended for the several persons named. The defendant refused to receive said vote because the names of the candidates were printed. The plaintiff complains of this as an injury, for which the defendant is liable to make reparation, and brings this suit to ascertain whether the defendant was justified in refusing to receive his vote on that account. The case requires us to decide whether, under our constitution, printed votes can be received for the several officers who are to be chosen by the freemen at the annual election.

RUTLAND,<br>February,<br>1832.

Temple<br>vs.<br>Mead.

The words of the constitution are, " The freemen of each town shall, on the day of the election for choosing representatives to attend the General Assembly, bring in their votes for Governor, with his name fairly written," &c. It then provides that the votes shall be sealed up and transmitted to the General Assembly, to be there counted. The same provision is made in relation to the votes for Lieut. Governor, Treasurer and Councillors, except that it is not required that the votes for Councillors shall be returned. The statute passed in 1815 requires that the votes of each freeman for the several officers aforesaid, shall be on one ticket or piece of paper, and that the presiding officer, together with the select-men, justices of the peace and town clerk, in the presence of the meeting, shall cut apart the votes given for Governor, Lieut. Governor, Treasurer, and Councillors, and enclose, certify, and seal them up separately, and transmit them as required by the constitution. If we were at liberty to consult the convenience of the voters alone, there is no doubt it would be greatly promoted by permitting the use of printed votes. From the terms, "fairly written," it has been supposed by some, that no other vote could be received, except those where the name of the person voted for was written with pen and ink. And if our decision is to be governed by the practice which probably prevailed at the time the constitution was adopted, and we are to suppose that the framers of that instrument meant to adopt that term as it was then understood in its ordinary acceptation, and intended to exclude every other species of writing, then indeed we must come to the conclusion that all votes must have the name of the person voted for written with pen and ink, and exclude every other species of writing, even that which is now so commonly used, writing with a pencil.

But I apprehend, in giving a construction to a constitution

RUTLAND,
February,
1832.

Temple
vs.
Mead.

which was to secure the rights and liberties of the citizens, and which was intended to present a frame of government and a mode of election for future generations, as well as for the one then on the stage, we are to regard its spirit, and endeavour to give effect to its provisions, without regarding too strictly the literal meaning of the terms made use of.

In deciding upon written contracts, we are frequently under the necessity of interpreting the language used, by recourse to certain technical rules of construction, wholly different from what the parties intended. But if, in interpreting the language of a constitution, a strict adherence to technical rules, or adopting terms made use of in their literal or strictly legal sense, would occasion a manifest departure from its spirit and intent, we may then resort to other rules of interpretation, in order to carry its provisions into effect.

In construing the clause of the constitution now under consideration, we ought not so to consider it as to lay the freemen under any unnecessary restraint or embarrassment in the expression of their opinion as to the most suitable person to fill the several public offices for which they may vote. We ought not to believe that it was intended that voting for those officers should always continue in the same particular manner, or that the votes should be of the same materials, or in the same way which was then in use, without any regard to the changes which might take place, or the improvements which might be made. This limited view of the constitution would wholly destroy the statute passed in 1815, under which all our elections are now made. On the other hand, we must not open a door which would lead to anarchy, nor should we give facilities to any measures which would tend to bribery and corruption, or essentially impair the purity of the elective franchise, and which the makers of the constitution would have guarded against, had it been foreseen.

Keeping in view these principles we may inquire what was intended by the article of the constitution under which this question has arisen ; whether it was meant to exclude printed votes, or whether we can infer from any other part that they would have been excluded if the term made use of did not sufficiently express this meaning. I apprehend that all which was intended in this article, was to secure to the freemen the privilege of voting for the several state officers therein named by ballot, as that term is usually and generally understood in this country ; and that while this privilege is secured, the form of the vote or ballot, or the man-

Rutland,
February,
1832.

Temple
vs.
Mead.

tier in which the name of the person intended for the office is impressed thereon, is wholly immaterial, if it is fairly and intelligibly expressed, and the manner does not expose the person voting to any improper influence, or those who are to receive and count the vote, to any unnecessary inconvenience or trouble.   In different parts of the constitution, and also in the various laws which have been passed to carry the same into effect, as well as in the practice thereon, it will be found that the terms vote, suffrage, and ballot, have been used as expressing the same meaning.   Thus in the 8th section of the constitution, the members of the House of Representatives are to be chosen by *ballot*.   In the election of the Governor, *&c.*, the people are to " bring in their votes," and if there is no election by the people, the " Council and General Assembly, by their joint *ballot*, are to elect," &c.   The oath prescribed to the freemen, 21st section, is, " whenever you give your *vote or suffrage*."   Sometimes the term vote is made use of to signify the opinion of the individual, as expressed by ballot ; sometimes as expressed viva voce, and sometimes for the collective opinion of a body of men.   Thus in section 14th, " The votes of the General Assembly shall be printed," &c., " with the yeas and nays, except when the *vote* shall be taken by ballot, and every member shall have a right to insert the reasons of his *vote* upon the minutes," &c.   The members of the General Assembly are sworn that " they will not assent to any bill, *vote* or resolution," &c.   These are examples of the use of the terms in all their different significations.   In relation to them it will be seen that we cannot give any technical definition of, or meaning to, any particular word used in the constitution, and adhere to the same meaning wherever the same word occurs.

In this country, and indeed in every country where offices are elective, different modes have been adopted for the electors to signify their choice.   The most common modes have been, either by voting viva voce, that is, by the elector openly naming the person he designates for the office, or by ballot, which is depositing in a box provided for that purpose, a paper on which is the name of the person he intends for the office.   The principal object of this last mode, is to enable the elector to express his opinion secretly, without being subject to be overawed, or to any ill will or persecution on account of his vote for either of the candidates who may be before the public.   The method of voting by tablets, in Rome, was an example of this manner of voting.   There certain officers appointed for that purpose, called Diribitores, de-

Rutland,
February,
1832.

Temple
vs.
Mead.

livered to every voter as many tablets as there were candidates, one of whose names was written upon every tablet. The vo-ter put into a chest prepared for that purpose which of these tab-lets he pleased, and they were afterwards taken out and counted. Cicero defines tablets to be little *billets,* in which the people brought their suffrages.

The clause in the constitution directing the election of the sev-eral state officers, was undoubtedly intended to provide that the election should be made by this mode of voting, to the exclusion of any other. In this mode the freemen can individually express their choice in an easy and convenient manner, without being under the necessity of publicly declaring the object of their choice ; their collective voice can be easily ascertained, and the evidence of it transmitted to the place where their votes are to be counted, and the result declared with as little inconvenience as possible.

If this can be effected as readily by the use of printed votes as by any other, and if no rights or privileges of either the freemen, or those who may be candidates for their suffrages, will be there-by infringed, most assuredly those votes ought to be received, if any freeman elects that method of expressing his opinion. And no one can confine a freeman to any particular way of voting by ballot, unless that way is unequivocally declared to be the only one by the law or by the constitution.

The adoption of printed votes is certainly an easy and conven-ient mode for the people to express their choice, and in one re-spect is preferable to any other. It will be less liable to mistakes arising from bad writing, misspelling, the omission of initial letters, or additions, to distinguish persons of the same name. It pre-sents no greater facilities to ascertain what ballot the freeman puts into the box, for he may vote as secretly by a printed ballot as by any other. The aggregate can be as readily ascertained, and the votes transmitted to the General Assembly to be counted with no greater inconvenience. We are therefore disposed to say that votes on which the names of the persons voted for are prin-ted, may as well be received as if they were written, according to the spirit and intent of the constitution.

Nor do we find any thing in the letter of that instrument which requires us to say that the votes should be written as the defen-dant contends. The definition of the word writing includes printing ; it means no more than conveying our ideas to others by letters or characters visible to the eye. It is so used by all writers

Addison,
January,
·1832.

Temple
vs.
Mead.

and generally comprehends printing, engraving, &c. in opposition to the mode of conveying them viva voce.

In all legal writers, and in the statutes which have been enacted in this state and elsewhere, the expression is made use of in the same general and comprehensive sense.

Several instances of this were mentioned in the argument.   A deed is defined to be a writing, signed, &c. ; yet it is always said that it may be printed.   The statute says, "no action shall be maintained on any agreement for the sale of lands," &c., unless the agreement, &c., be in writing, and signed by the parties.   Other contracts, to be legally binding, are required to be in writing.

It would not be contended that, by these statutes, an agreement wholly in print, signed by the parties, would be ineffecutal. Writs are defined to be precepts in writing, yet it is notorious that they are printed.   In some states, not only the writs, but the names of the clerks or prothonotaries, from whose office they issue, are printed.   The instances are numerous in which printing is considered essentially the same as writing.

This same question has lately been agitated in the state of Massachusetts, in a case between Henshaw, plaintiff, and Foster and others, defendants, under a constitution where the expression is similar to ours.   Chief Justice Parker, in a very able and elaborate opinion, shows most clearly that the use of printed votes is not contrary to the letter or spirit of the constitution, but is in strict conformity to both : and he was sustained by the decision of the other members of the Court.

It has been said that the decision of the Supreme Court of the state of Maine is to the same effect.

This case was argued at the last term of this Court.   The Court had it under consideration.   Judge Thompson, who took the papers, and whose sickness and death prevented his giving the opinion of the Court, concurred in the result to which we have arrived at this time ; and I am authorised by the Chief Justice who heard the argument at the last term, but who is not present at this time, to say, that his opinion was with the plaintiff on this point, that a vote on which the name of the person voted for, is printed, is in conformity with the constitution.

The opinion of the Court on this part of the case is, that the plaintiff had a right to vote for the persons for the several offices of Governor, Lieut. Governor, Treasurer and Councillors, by a vote on which the names of the persons voted for, for those offices respectively, was printed, designating the offices intended for

RUTLAND,
February,
1832.

Temple
vs.
Mead.

the persons voted for ; that his vote which was offered ought to have been received and put into the ballot-box ; and that the defendant, as presiding officer of the freemen's meeting, erred in not receiving the vote which was offered, on account of the names being printed thereon.

This, by the agreement of the parties, entitles the plaintiff to a judgement, or to an affirmance of the judgement of the county court.

Lest, however, from the decision, it should be thought that we consider the presiding officer liable in all cases for refusing to receive a legal vote, agreeably to the decision in some one or more of our sister states, we deem it proper to say, that the declaration charges the defendant with having *maliciously* rejected, or refused to receive the vote of the plaintiff. It is not certain that the facts agreed on present a case of malice on the part of the defendant, but on the contrary it appears to be only an error in judgement on a point which was considered doubtful. Whether in the latter case the defendant would be liable, has not been made a question in the argument,—nor have we been called on to decide in what cases a constable or other officer presiding at a freemen's meeting, would render himself liable by refusing to receive a legal vote. We are unwilling to have it considered that this question is decided in this case, especially as it has not been urged in argument by either party.

If there has been any mistake or oversight in drawing up the case, or if all the facts are not disclosed which tend to show the motives of the defendant, we should be disposed to listen to an application on his behalf for another trial, in which the jury can determine in relation to his motives. Otherwise, the judgement must be according to the agreement of the parties, that the judgement of the county court be affirmed with costs.

*Ormsbee,* for plaintiff.

*Royce & Hodges,* for defendant,