STATE OF NEBRASKA, EX REL. CHESTER NORTON,
v. CHARLES VAN CAMP, COUNTY CLERK, AND
JAMES G. KRUSE, INTERVENOR.

36   91
37  313
36   91
46  533
46  737

FILED JANUARY 17, 1893. No. 5880.

1. **Certificate of Election:** DUTIES OF CANVASSING OFFICERS: MANDAMUS: STATE LEGISLATURE. While each house of the legislature is, by the constitution, made the judge of the election and qualification of its members, the courts will, by *mandamus*, compel the proper canvassing officers to discharge their duties and issue certificates of election to the parties who, from the returns, appear to have been elected thereto, but the awarding of a certificate of election in obedience to the mandate of the court will not conclude the legislature in determining the question in proceedings by contest.

2. **Supreme Court:** INTERPRETATION OF CONSTITUTIONAL AND STATUTORY PROVISIONS. An interpretation given to a statutory or constitutional provision by the court of last resort becomes a standard to be applied in all cases, and is binding upon all departments of the government, including the legislature.

3. ——: ——: ELECTIVE FRANCHISE: REPRESENTATION. It is contemplated by our constitution and the election laws enacted in pursuance thereof that every qualified elector of the state shall be entitled to vote at some precinct or voting place for the respective state and county officers at each election. Hence, a construction will not be adopted which would have the effect to disfranchise a considerable number of voters or to deprive a county of representation in the legislature unless such construction is rendered necessary by express and unequivocal language of the statute or constitution.

4. **County Organization:** UNORGANIZED TERRITORY: REPRESENTATIVE DISTRICTS. B. county was organized in 1891, at which time it was unorganized territory, and has never, by general apportionment law or special act, been attached to any representative district. It is a narrow strip lying between H. county and the northern boundary of the state, eight townships long from east to west and has less than three townships in width. It adjoins K. county along its entire eastern boundary, although further west it extends north to the 43d parallel about

ten miles beyond the northern boundary of K. county, at which point it is bounded on the east by the state of South Dakota. *Held*, That it is directly west of K. county, within the meaning of section 146, chap. 18, Comp. Stats., and was, while unorganized territory, attached to said county for election purposes. MAXWELL, Ch. J., dissents.

5. ——: ——: ——. The legislature never having attached it to any representative district, it remains a part of the 20th district, notwithstanding its organization as a county. MAXWELL, Ch. J., dissents.

6. **Extension of County Boundaries**: UNORGANIZED TERRITORY: ELECTIONS. In 1883 an act was approved extending the boundaries of H county directly north, so as to include the unorganized territory which is now B. county, but providing that it should not take effect until a majority of the legal voters of said county should give their assent at the next general election. At the general election in 1883 there were cast in said county 1,821 votes, of which 878 only were in favor of said proposition. *Held*, That the proposition was defeated, and an order entered by the county board in 1885 declaring it adopted is a nullity.

7. ——: ——: ATTACHMENT OF COUNTIES FOR ELECTION PURPOSES. The boundaries of H. county being clearly defined by law, and not including any part of the territory subsequently organized as B. county, *held*, there could be no *de facto* attachment of the latter to the former so as to entitle the voters thereof to participate in elections in H. county. MAXWELL, Ch. J., dissents.

8. **Election Returns**: DUTIES OF CANVASSING BOARD: CERTIFICATES OF ELECTION. It is settled by a long line of decisions of this court that a canvassing board has no authority to go behind the returns and inquire into the legality of the votes. Their duty is to canvass the votes as certified to them, and a certificate of election issued upon a canvass of a part of the vote of a representative district is without authority of law, and void.

9. **Regularity of Nomination of Candidates**: CERTIFICATES. Neither a canvassing board nor the court in a *mandamus* proceeding will inquire into the regularity of the nomination of the candidates, nor the sufficiency of their certificates of nomination. MAXWELL, Ch. J., dissents so far as it applies to courts.

10. ——. *Held*, On the proofs, that the nomination of the relator was regular and sufficient in form and substance. MAXWELL, Ch J., dissents.

State, ex rel. Norton, v. Van Camp.

11. **Construction of Election Law.** Provisions of the election law which are not essential to a fair election will be held to be formal and directory only unless declared to be mandatory by the law itself.

12. **Written and Printed Ballots.** The vote of B. county for the relator should not be rejected, for the reason that his name was written on the sample and official ballots by the clerk after they had been printed and were ready for distribution. MAXWELL, Ch. J., dissents.

13. **Ballots:** DESIGNATION OF REPRESENTATIVE DISTRICT. Votes for representative will not be rejected because the number of the district is not designated upon the official ballot in counties included in one district only.

ORIGINAL application for *mandamus* to compel the respondent, Charles Van Camp, county clerk of Knox county, to call to his assistance two disinterested electors of the twentieth representative district, and with them compare the abstracts of votes cast at the election held November 8, 1892, made by the canvassing boards of the counties of Knox and Boyd for representative, and returned to said county clerk of Knox county by the county clerks of said counties, and issue to the person appearing from said abstracts to have the highest number of votes a certificate of election as representative from said twentieth district in the legislature of Nebraska to convene January 3, 1893. *Writ allowed.*

*A. W. Agee,* for relator.

*A. J. Sawyer* and *Thomas H. Matters, contra*

POST, J.

It is an elementary rule that the writ of *mandamus* will be denied unless the right of the petitioner to the relief demanded is clear. That rule applies with especial force to cases like the one under consideration, where the subject of the controversy is the office of representative in the legis-

lature. It is a fact known to all, and to which we cannot close our eyes, that in like cases, particularly in times of unusual political excitement, partisan bias and prejudice are liable to be imputed to judges on account of the soundest decisions, and by men who would without hesitation submit to their judgment controversies involving their fortunes and their honor. It is not my purpose to comment upon this peculiarity of our national character, or to condemn it as existing without sufficient cause. But attention is directed to it as an additional reason why the courts of the country should refuse to interfere, except in cases where the right is clear and the duty plainly enjoined by law. I have, however, no hesitation in saying that this case is clearly within both the letter and the spirit of the rule. In fact, there is no question of law involved herein but has been settled by repeated decisions of this court, to which I will hereafter refer. But before discussing the case upon its merits I will notice the argument against the jurisdiction of the court, on the ground that the house of representatives is made the exclusive judge of the election and qualification of its members, and that the judgment of the court would tend to forestall action by the law making power, although that argument is too trite to call for especial notice at this time. The courts *have* jurisdiction in such cases, fortunately for the cause of constitutional government. That fact is too well settled to admit of controversy. As said by Judge McCrary, in his work on the Law of Elections, 350: "The courts will not undertake to decide upon the right of a party to hold a seat in the legislature where by the constitution each house is made the judge of the election and qualification of its own members, but a court may, by *mandamus*, compel the proper certifying officers to discharge their duties and arm the parties elected to such legislative body with the credentials necessary to enable them to assert their rights before the proper tribunal."

State, ex rel. Norton, v. Van Camp.

It is contemplated that each house of the legislature shall be organized by the persons who are *prima facie* members thereof. It requires no argument to prove the disastrous consequences of a different construction of the constitution. An illustration is quite sufficient for the purpose. In *State, ex rel. Christy, v. Stein,* 35 Neb., 848, and two other cases involving the same issues recently decided by this court, the controversy was, who upon the face of the returns were entitled to certificates of election. Suppose the respondent, the clerk of Clay county, had issued certificates to the relators therein, will it be contended that the court would have been powerless to afford relief, and that the relators must have been permitted to participate in the organization of the legislature to which they were not elected, simply because the canvassing officer had been guilty of misfeasance or malfeasance in office? Yet the case at bar is much stronger on its merits than the imaginary one. Here the question of the relator's right to a certificate of election is but an incident to the more important question of the rights of the people of Boyd county to representation in the popular branch of the legislature. For it is too plain for argument that unless said county is included within the twentieth representative district, the people thereof are disfranchised so far as representation in the house is concerned; and that such anomalous condition must continue until 1899, which will be the first legislature elected under the next apportionment law. It is also argued against our jurisdiction that the house of representatives will not be bound by the judgment of the court and may entirely ignore or defy its authority. It must be confessed that legislative bodies frequently fail to distinguish clearly between the power and the right in questions involving party supremacy. This is a weakness common to parties and of which all have furnished conspicuous illustrations. But our duty as well as our responsibility ends with a determination of the controversy submitted to us. It may

be suggested, however, in this connection that there are some things which are conclusively presumed and which no court will permit to be questioned in advance, among which is that a co-ordinate branch of the government will not resort to revolutionary methods. A careful examination into the subject will prove that there can be no conflict of jurisdiction between the legislative and judicial departments of the government. The extent to which judicial power will be exercised is to compel ministerial officers to discharge their duty and issue certificates of election to the parties entitled thereto upon the face of the returns, leaving it to the legislature to determine the question of the validity of the election.

The last proposition, however, is subject to one qualification, viz., where the court of last resort has placed a construction upon a constitutional or statutory provision, such construction is binding upon all departments of the state government including the legislature. (See Cooley's Const. Limitations [5th ed.], 55, 56.) As said by one of the ablest of authors, "an interpretation of an act by the court of last resort under a constitutional government becomes a part of the act itself." An illustration of this rule is found in the case of *State v. Van Duyn*, 24 Neb., 586. By the legislative apportionment act of 1881, Sarpy county comprised the eighth representative district and was entitled to one representative. That act was repealed by the act of 1887, which provides that the eighth district shall consist of Cass and Otoe counties, but making no provision for a representative from Sarpy county. It was held in the case named, the present chief justice delivering the opinion of the court, that the legislature could not deprive a county of representation in that body, hence the present apportionment law is unconstitutional so far as Sarpy county is concerned and that county is entitled to a member of the house under the former act. The judgment of the court in that case was certainly binding upon

the legislature, and while the house may have the power, it would have no more right to exclude the member elect from that county than from any other county of the state.

2. This controversy is between Norton, the relator, and Kruse, the intervenor, who were at the late election the candidates of the republican and independent parties for representative of twentieth representative district.

In Knox county the vote as returned and canvassed is as follows:

Kruse, independent.................................... 723 votes
Norton, republican.................................... 681  "
Sherman, democrat.................................... 509  "
Buckmaster, prohibition............................. 112  "

In Boyd county the vote as canvassed and returned to the county clerk of Knox county is—

Norton................................................ 201 votes
Kruse.................................................    4  "
Sherman...............................................   30  "

It is apparent from the above tables that if the relator is entitled to have counted in his favor the votes cast in Boyd county he is entitled to the certificate of election and the writ of *mandamus* was properly allowed.   The apportionment act of 1887 provides that Knox county shall comprise the twentieth representative district and be entitled to one representative.   But by sections 146 and 147 of chapter 18, Comp. Stats., entitled "Counties and County Officers," it is provided as follows:

"Sec. 146. All counties which have not been organized in the manner provided by law, or any unorganized territory in the state, shall be attached to the nearest organized county directly east for election, judicial, and revenue purposes;  *  *  *  *Provided further*, That if no county lies directly east of any such unorganized territory or county, then such unorganized territory or county shall be attached to the county directly south, or if there be no such county, then to the county directly north, and if there be no county

directly north, then to the county directly west of such unorganized territory or county.

"Sec. 147. The county authorities to which any unorganized county or territory is attached shall exercise control over, and their jurisdiction shall extend to, such unorganized county or territory the same as if it were a part of their own county."

Repeated constructions have been given to the above provision by this court, uniformly to the effect that for all purposes of county government unorganized territory is attached to the nearest county directly east thereof. For instance, in *Ex parte Crawford*, 12 Neb., 379, it was held that the district court of Holt county had jurisdiction to punish for crimes committed in the unorganized territory directly west of that county. In the opinion of the court LAKE, chief justice, says: "As to these three purposes (election, judicial, and revenue) there are no restrictive or qualifying words in the act, but the attachment becomes complete and said territory to all intents made practically a part of that county. Indeed this effect is made still more manifest, if possible, by reference to the next section which provides [quoting section 147]. The full extent of such jurisdiction and control can be correctly measured only by a resort to all the various laws relative to county officers and their duties respecting election, judicial, and revenue matters."

Boyd county was organized in pursuance of an act approved April 9, 1891, and is a strip eight townships in length extending from east to west and less than three townships in width at the widest point, all of which, with the exception of a small fraction, was acquired by this state under the provisions of an act of congress approved March 23, 1882, and which was, at the time named, within the boundary of Dakota Territory. The act above mentioned also provides that the jurisdiction of this state shall not attach to the territory so acquired until the extinguishment

of the Indian title thereto, and the announcement thereof by proclamation of the president; which, according to admissions of counsel, was October 23, 1890. It is apparent from an examination of a correct map of the state that under the general act referred to this territory could be attached to no organized county of the state other than Knox for any purpose. It is bounded on the east by Knox and no other county of the state. It is true the line of the eastern boundary is short, not exceeding one congressional township and a half. It is also true that the northern boundary extends about the same distance beyond the northernmost limit of Knox county and lies directly west of a portion of South Dakota. It is a rule of construction, universally recognized, that acts which confer or extend the elective franchise should be liberally construed. (See Sutherland, Stat. Con., sec. 441.) Here is a prosperous county of the state rapidly developing in population and wealth which it is proposed to disfranchise upon the barest technicality, for there is no provision for the dividing of unorganized territory between two or more counties except that contained in section 148, which is that where two or more counties lie directly east of an unorganized county "the portions of territory of such unorganized county which lie either north or south of a line running directly west and in continuation of the boundary line between such organized counties shall be attached to the organized county directly east of such territory for all purposes of this subdivision." A statute should never be so construed as to work a public mischief, unless such construction is required by the explicit and unequivocal language of the act or by necessary implication therefrom. (*People v. Lambier*, 5 Denio [N. Y.], 9; *Smith v. People*, 47 N. Y., 330.) In Sutherland, Stat. Con., sec. 323, it is said: "But an interpretation of a statute which must lead to consequences which are mischievous and absurd is inadmissible, if it is susceptible of an interpreta-

tion by which such consequences may be avoided." The. opinion of the chief justice in *State v. Van Duyn, supra,* is. regarded as a leading authority in support of the above rule and is without doubt directly in point. We should adopt that construction, when possible, which will secure to the people of the state their constitutional right to vote for and be represented by officers of their choice, although such construction may not be the most obvious or natural from the language of the statute.

3. It follows that on the extinguishment of the Indian title to the territory now comprising Boyd county, and notice thereof by the proclamation of the president, said territory, by virtue of the general statute, became attached to Knox county for election purposes and became a part of the twentieth representative district, and has never been attached to any other representative district, either by general or special act. It is settled beyond controversy in this state that the legislature cannot, under the pretense of subdividing a county or the state for election purposes, disfranchise a part of the people by making no provision for the exercise of their constitutional rights. In addition to *State v. Van Duyn* see *Peard v. State,* 34 Neb., 372, and authorities cited. It is not the province of the courts to. supply omissions by the legislature, but, as said by Judge Niblack, in *Duncan v. Shenk,* 109 Ind., 26, "Our election laws were enacted upon the evident theory that every qual-. ified voter of the state is entitled to vote at some precinct or voting place at every election except when restrained by some provision of the state constitution."

4. The chief justice has filed a dissenting opinion in which he argues that Boyd county is for election purposes attached to Holt county. Before noticing the reasons advanced for his conclusion I will say that in my opinion the boundaries of Holt county are clearly defined by law, and there could be no *de facto* attachment thereto of Boyd county for election purposes; hence the objection to the

proofs of the intervenor upon that branch of the case is so obviously sound as to render further examination unnecessary.   The only warrant for the claim that Boyd county is attached to Holt county for any purpose is the act of March 1, 1883, providing that all of said territory should be attached to the last named county, provided a majority of the legal voters thereof should give their assent to the proposition at the next general election.   At the general election of 1883 there were cast 1,821 votes in said county, of which 872 only were in favor of said proposition.   It is clear, upon authority, that the proposition was defeated.  (*State v. Lancaster Co.*, 6 Neb., 474.)  And such appears to have been the understanding at the time, for one of intervenor's witnesses, a resident of Holt county, testifies that it was generally understood that the proposition was defeated, and that the county clerk refused to certify that it had carried.   But on the 23d day of January, 1885, a resolution was adopted by the county board declaring it carried.   It appears, however, from the several acts of the legislature, subsequent to 1883, that the territory in question was always, prior to the organization of Boyd county, regarded as unorganized territory.   For instance, in the judicial apportionment of 1887 the twelfth district included Holt county and the unorganized territory north of said county, and by the legislative apportionment act of 1887 the thirteenth senatorial district includes the unorganized territory north of Holt county.   The attaching of said territory to judicial and senatorial districts which adjoin it on the south, but not on the east, without reference to it in the section defining representative districts, indicates an intention on the part of the legislature for it to become, when the Indian title should be extinguished, a part of the twentieth representative district, by virtue of the general statute.   But if anything is lacking in the way of legislative construction it is supplied by the act creating Boyd county, which provides that "The unorganized

territory lying north of Holt county be organized into a
new county and be called Boyd county." (Laws of 1891,
224.)

5. I observe from the opinion of the chief justice that
he has overlooked several material facts, which is due, no
doubt, to the lack of time for its preparation, since it ap-
pears to have been filed before there had been an opportu-
nity to assign the case to a member of the majority to
prepare the opinion of the court.   For instance he says:
" The proof shows beyond question that Boyd county has
in fact been attached to Holt county from 1883 to 1890;
that two years ago one of the representatives from the
district comprising what is now Holt and Boyd counties
was a resident of Turtle Creek township, in what is now
Boyd county; that a supervisor from that precinct sat
with the supervisors of Holt county and the latter levied
taxes in that county which were collected and paid.   These
things were a matter of record which seems to have been
kept in Holt county.   This state of affairs continued until
Boyd county was organized two years ago.   There is no
proof to the contrary on this point, so that it is established
beyond a doubt."   It does appear from the testimony of
witnesses that for the years 1888 and 1889 Turtle Creek
township, now a part of Boyd county, elected a supervisor
who sat with the county board of Holt county, and that
the last named county assessed and collected taxes on the
property in said township for the years named.   It also
appears that a resident of Turtle Creek township was in
the fall of 1890 a candidate for the office of representative
from Holt county.   Further than this the foregoing state-
ment is not warranted by the proofs.   There is no evidence
within my knowledge of the case that Holt county ever ex-
ercised or claimed jurisdiction for any purpose over any part
of Boyd county, aside from the township above named,
or at any time prior to the year 1888, nor is the ground
of its assumed jurisdiction over a fraction thereof appar-

ent from the record.    Had a resident of Boyd county been permitted to represent Holt county in the legislature, that fact might be regarded as a legislative construction of more or less weight, but the assertion of the chief justice is contradicted by the undisputed proofs, which show that the candidate referred to was defeated.    There is, however, one fact which alone is conclusive of the question of a *de facto* annexation, viz., since the approval of the act creating Boyd county there has been no person in either county, so far as the record discloses, who has ever regarded that county as a part of the fiftieth representative district which is comprised of Holt county.    That district is entitled to two members of the house and it is fair to presume that there were, at the election in 1892, at least four candidates for representative.    Yet we have no evidence that certificates of nomination were filed by any of them in Boyd county.    On the other hand it is apparent that said county was regarded by all of the leading political parties as a part of the twentieth district, since it appears from the documentary evidence that on the 16th day of September, 1892, the certificate of nomination of Z. G. Sherman, by the democratic party of the twentieth representative district, was filed with the clerk of Boyd county. On the 15th day of October following the certificate of the relator was filed in said county and on the 24th day of October fifty-three persons, claiming to be electors of the twentieth district, filed a petition, in due form, requesting the clerk of said county to place the name of Kruse, the intervenor, on the ticket as the independent candidate for representative from said district.    The clerk having refused to place the name of the relator upon the official or sample ballot, the latter applied to Hon. M. P. Kinkaid, one of the judges of the fifteenth judicial district, for a writ of *mandamus* requiring the clerk to print his name on the ballot, which application was heard upon sufficient notice and the writ allowed as prayed.

It is suggested by the chief justice that the petition above referred to was filed by friends of Kruse without his knowledge, after the institution of the *mandamus* proceeding, but here, too, he misconceives the record. The intervenor's petition aforesaid was filed in Boyd county October 24, while the application for the writ of *mandamus* was not made until the next day. It further appears from the poll book introduced in evidence that at the general election in 1890, at which the intervenor was a candidate for representative from the twentieth district, there were cast by residents of Boyd county at the nearest polling place in Knox county seventy-nine votes, of which eight only were challenged. The question of the legality of these votes is not involved in the present controversy, but reference is made to them for the purpose of showing that so far as there existed a *de facto* annexation of that territory to any organized county it was to Knox and not to Holt county.

6. The chief justice further says: "There is no proof that a call for a convention of this kind (of Knox and Boyd counties) was made by any one; or that the republicans of Boyd county were invited or even notified to attend. * * * No doubt the convention in this case was a fair convention of Knox county, but it should appear from the proof that Boyd county was invited to participate therein." There is no proposition more firmly settled by decisions of this court than that neither the canvassing board nor the court in a *mandamus* proceeding will go behind the returns and inquire into the legality of the votes. (*Hagge v. State*, 10 Neb., 51; *State v. Stearns*, 11 Id., 106; *State v. Peacock*, 15 Id., 442; *State v. Wilson*, 24 Id., 139; *State v. Elder*, 31 Id., 169.) In the first case cited above the present chief justice, referring to canvassing officers, uses the following pertinent language: "Their duties are purely ministerial. If illegal votes have been cast or irregularities occurred affecting the right of the person declared elected to office the law provides for contesting such

election, but a canvassing board cannot go behind the returns." And in the last named case in which a writ of *mandamus* was allowed against the speaker of the house of representatives requiring him to open and publish the returns of the election for state officers, he says: "The rule is that each board is to receive the returns transmitted to it, if in due form, as correct, and ascertain and declare the result as appears from such returns." On the authority of the cases cited it is clear that we have no right to inquire into the regularity of the relator's nomination. However, authorities directly in point are not wanting. In *People v. Shaw*, N. Y. Court of Appeals, 31 N. E. Rep., 512, and *State v. Board of Canvassers of Cascade Co.*, 31 Pac. Rep., 536, Sup. Court Mont., both arising under the Australian ballot law, it is held that the canvassers could not go behind the returns for the purpose of inquiring into the legality of the nomination of the candidates. But it is apparent that the nomination of the relator was regular and sufficient, both in form and substance. It will be observed that the chief justice does not say that there was any offer to show that Boyd county was not in fact represented at the convention in question. The truth is, there was no such proof. But suppose, for the sake of argument, that such was the fact and Boyd county was not included in the call for the convention and was not represented therein. The court will not so construe the law as to disfranchise the voters of that county for any such irregularity. A strong case in this court is *State v. Thayer*, 31 Neb., 82, in which it was held that an election to fill a vacancy in the office of district judge was valid, although the notice prescribed by law for such an election had been entirely omitted on the ground that such provision is merely directory.

7. As to the form of the certificate, which is set out at length below, it is doubtful if there has ever been one more formal and complete filed in any office in the state:

"The State of Nebraska, ⎱ ss.
      Knox County.          ⎰

    "We, W. H. Needham, chairman, and E. H. Purcell, secretary, presiding officers and secretary of the republican convention of the twentieth representative district of Nebraska had and held in Creighton, in Knox county, state of Nebraska, on the 26th day of July, 1892, pursuant to a call for the purpose of making nomination to public office for said representative district as the candidate of the republican party, certify that the said convention was made up and composed of electors representing the republican party, being a political party which, at the last election before holden, said representative district convention polled at least one per centum of the entire vote cast in said district; that said convention was duly organized by the election of W. H. Needham, a resident of Bloomfield, of Morton township, in Knox county, as its chairman and presiding officer, and by the election of E. H. Purcell, of Verdigris township, in Knox county, as secretary, members of said convention, and that the following nomination was made by said convention, resident of said representative district, at the place immediately following the name, to-wit: For representative of twentieth district of Nebraska, *Chester A. Norton*, of Morrillville P. O., Knox county, Nebraska. The said named person is a regular nominee of the republican party of said twentieth representative district of Nebraska for the respective office immediately preceding his name, and his name should be printed on the sample and official ballots as a candidate of the republican party in and for said representative district for said office.

                                          "W. H. Needham,

    "*Chairman of the republican party of the twentieth representative district of Nebraska, residence in said representative district at Bloomfield, Knox county, Nebraska.*
                              "————— —————.

    "*Secretary of the republican party of the twentieth representative district of Nebraska, residence in said representative district, Verdigris P. O., Knox county, Nebraska.*

State, ex rel. Norton, v. Van Camp.

"THE STATE OF NEBRASKA, }
     KNOX COUNTY.

"I, W. H. Needham, being first duly sworn, depose and say that I am a resident of Bloomfield, in Morton township, in said county and state; that I was duly elected chairman and presiding officer of the republican convention of the twentieth representative district of Nebraska, had and held at Creighton, in said county, on the 26th day of July, 1892; that I signed the written certificate of nomination as chairman and presiding officer of said convention, and that said certificate and the statements therein contained are true to the best of my knowledge and belief.                    W. H. NEEDHAM,
                                  " Chairman.

"Sworn to before            W. C. MILLER,
                        " Notary Public of Knox Co.

"THE STATE OF NEBRASKA, }
     KNOX COUNTY.

"I, E. H. Purcell, being first duly sworn, depose and say that I am a resident of Verdigris, in Verdigris township, in said county and state ; that I was duly elected secretary of the republican convention of the twentieth representative district of Nebraska, held at Creighton, in said county, on the 26th day of July, 1892 ; that I signed the written certificate of nomination as such secretary, and that said certificate and the statements therein contained are true to the best of my knowledge and belief.
                           " E. H. PURCELL,
                                  " Secretary.

" Sworn to before           D. E. JOHNSON,
                        " Notary Public, Knox Co."

8. The chief justice further says: "It is true the name of the relator is written on both the sample and official ballots, but this does not comply with the law. That requires them to be printed on both." It should be stated in this connection that the clerk of Boyd county, after the

writ of *mandamus* had been served upon him, wrote the relator's name with ink upon both the official and sample ballots which had been printed and were ready for distribution, presumably to save the cost of printing others. It was held by this court in *State v. Russell*, 34 Neb., 116, that the provision of our law for the making of ballots with ink is directory only, and that ballots otherwise regular should not, in the absence of fraud, be rejected because they are marked with a pencil. In the absence of a plain provision to the contrary, a printed instrument will be held to comply with a statute providing for a written one. In *Temple v. Mead*, 4 Vt., 535, it was held that printed ballots are within the meaning of a constitutional provision requiring them to be "fairly written." And to the same effect is *Henshaw v. Hoster*, 9 Pick. [Mass.], 312. This court has uniformly held those provisions of the election law to be formal and directory merely, which are not essential to a fair election unless declared to be mandatory by the statute itself. In the appendix to Mr. Wigmore's Treatise on the Australian Ballot Law, he says: "Wherever our statutes do not expressly declare that particular informalities avoid the ballot, it would seem best to consider their requirements as directory only. The whole purpose of the ballot, as an institution, is to obtain a correct expression of intention, and if in a given case the intention is clear, it is an entire misconception of the purpose of the requirements to treat them as essentials, that is, as objects in themselves, and not merely as means." There is no claim that the writing of the relator's name on the ballots was a distinguishing mark within the meaning of the statute, and it is plain that it was not. (*State v. Russell, supra.*) We cannot adopt the strict construction contended for by the chief justice, without reversing a well recognized rule of this court, and disregarding the settled law on the subject.

9. There is still another objection argued by counsel, viz., that the votes cast for the relator in Boyd county are void

for the reason that the number of the district was not designated upon the ballots. Upon both the official and sample ballots his name appears under the following printed direction: "For representative —— district. Vote for one." In *State v. Howe*, 28 Neb., 618, it was held that words descriptive of the district do not constitute a part of the legal designation of the office, and may be treated as surplusage. That case is conclusive of the question now under consideration. The question of the effect of such an omission in counties included within two or more districts is not involved in the objection and is not determined. The tendency of the judiciary should always be in the direction of conservatism, and any encroachment upon the powers conferred upon the other departments of the government should be strenuously resisted. The questions involved in this case, however, are purely judicial, and, as has been shown, have all been settled by previous decisions of this court. Boyd county is not only a part of the twentieth representative district, but the nomination of the relator is in substantial compliance with law, and the votes cast for him in said county should be counted in his favor. Since it was the duty of the canvassing board to canvass all the votes certified to it from the counties of Knox and Boyd and to issue a certificate to the party appearing therefrom to have been elected, the certificate issued to the intervenor upon a canvass of the vote of Knox county only is without authority of law, and void, and the writ of *mandamus* should be allowed as prayed.

WRIT ALLOWED.

NORVAL, J., concurs.

MAXWELL, CH. J., dissents. See *ante*, p. 9.