Justice Scalia,
concurring in the judgment.
Plaintiffs claim the First Amendment, as applied to the States through the Fourteenth Amendment, forbids the State of Washington to release to the public signed referendum petitions, which they submitted to the State in order to suspend operation of a law and put it to a popular vote. I doubt whether signing a petition that has the effect of suspending a law fits within “the freedom of speech” at all. But even if, as the Court concludes, ante, at 194-195, it does, a long history of practice shows that the First Amendment does not prohibit public disclosure.
We should not repeat and extend the mistake of McIntyre v. Ohio Elections Comm’n, 514 U. S. 334 (1995). There, with neither textual support nor precedents requiring the result, *220 the Court invalidated a form of election regulation that had been widely used by the States since the end of the 19th century. Id., at 371 (Scalia, J., dissenting). The Court held that an Ohio statute prohibiting the distribution of anonymous campaign literature violated the First and Fourteenth Amendments.
Mrs. McIntyre sought a general right to “speak” anonymously about a referendum. Here, plaintiffs go one step further — they seek a general right to participate anonymously in the referendum itself.[1] Referendum.petitions are subject to public disclosure under the Public Records Act (PRA), Wash. Rev. Code § 42.56.001 et seq. (2008), which requires government agencies to “make available for public inspection and copying all public records,” subject to certain exemptions not relevant here. §42.56.070(1). Plaintiffs agcontend that disclosure of the names, and other personal information included on the petitions, of those who took this legislative action violates their First Amendment right to anonymity.
*221 Today’s opinion acknowledges such a right, finding that it can be denied here only because of the State’s interest in “preserving the integrity of the electoral process,” ante, at 197. In my view this is not a matter for judicial interest balancing. Our Nation’s longstanding traditions of legislating and voting in public refute the claim that the First Amendment accords a right to anonymity in the performance of an act with governmental effect. “A governmental practice that has become general throughout the United States, and particularly one that has the validation of long, accepted usage, bears a strong presumption of constitutionality.” McIntyre, supra, at 375 (Scalia, J., dissenting).
I
When a Washington voter signs a referendum petition subject to the PR A, he is acting as a legislator. The Washington Constitution vests “[t]he legislative authority” of the State in the legislature, but “the people reserve to themselves the power ... to approve or reject at the polls any act, item, section, or part of any bill, act, or law passed by the legislature.” Art. 2, § 1. This “referendum” power of popular legislation is exercised by submitting a petition, in accordance with certain specifications, to the Washington secretary of state with valid signatures of registered voters in number equal to or exceeding four percent of the votes cast in the last gubernatorial election. § 1(b); Wash. Rev. Code § 29A.72.100, 130, 140, 150, 160 (2008).
The filing of a referendum petition that satisfies these requirements has two legal effects: (1) It requires the secretary to place the measure referred to the people on the ballot at the next general election; and (2) it suspends operation of the measure, causing it only to have effect 30 days after it is approved during that election. Art. 2, § 1(d). See Brief for Respondent Reed 2-6. A voter who signs a referendum petition is therefore exercising legislative power because his signature, somewhat like a vote for or against a bill in the *222 legislature, seeks to affect the legal force of the measure at issue.[2]
Plaintiffs point to no precedent from this Court holding that legislating is protected by the First Amendment.[3] Nor do they identify historical evidence demonstrating that “the freedom of speech” the First Amendment codified encompassed a right to legislate without public disclosure. This should come as no surprise; the exercise of lawmaking power in the United States has traditionally been public.
The public nature of federal lawmaking is constitutionally required. Article I, § 5, cl. 3, requires Congress to legislate in public: “Each House shall keep a Journal of its Proceedings, and from time to time publish the same, excepting such Parts as may in their Judgment require Secrecy; and the Yeas and Nays of the Members of either House on any question shall, at the Desire of one fifth of those Present, be entered on the Journal.”[4] State constitutions enacted around *223 the time of the founding had similar provisions. See, e. g., Ky. Const., Art. I, §20 (1792); Ga. Const., Art. I, §15 (1798). The desirability of public accountability was obvious. “[A]s to the votes of representatives and senators in Congress, no man has yet been bold enough to vindicate a secret or ballot vote, as either more safe or more wise, more promotive of independence in the members, or more beneficial to their constituents.” 1 J. Story, Commentaries on the Constitution §841, p. 591 (4th ed. 1873).
Moreover, even when the people asked Congress for legislative changes — by exercising their constitutional right “to petition the Government for a redress of grievances,” U. S. Const., Arndt. 1 — they did so publicly The petition was read aloud in Congress. Mazzone, Freedom’s Associations, 77 Wash. L. Rev. 639,' 726 (2002). The petitioner’s name (when large groups were not involved), his request, and what action Congress had taken on the petition were consistently recorded in the House and Senate Journals. See, e. g., Journal of the Senate, June 18, 1790, 1st Cong., 1st Sess., 163; Journal of the House of Representatives, Nov. 24, 1820,16th Cong., 2d Sess., 32. Even when the people exercised legislative power directly, they did so not anonymously, but openly in townhall meetings. See generally J. Zimmerman, The New England Town Meeting (1999).
Petitioning the government and participating in the traditional town meeting were precursors of the modern initiative and referendum. Those innovations were modeled after similar devices used by the Swiss democracy in the 1800’s, and were first used in the United States by South Dakota in 1898. See S. Piott, Giving Voters a Voice 1-3, 16 (2003). The most influential advocate of the initiative and referen *224 dum in the United States analogized the Swiss practice to the town meeting, because both “required open conduct of political affairs and free expression of opinions.” Id., at 5 (discussing J. W. Sullivan, Direct Legislation by the Citizenship through the Initiative and Referendum (1892)). Plaintiffs’ argument implies that the public nature of these practices, so longstanding and unquestioned, violated the freedom of speech. There is no historical support for such a claim.
II
Legislating was not the only governmental act that was public in America. Voting was public until 1888 when the States began to adopt the Australian secret ballot. See Burson v. Freeman, 504 U. S. 191, 203 (1992) (plurality opinion). We have acknowledged the existence of a First Amendment interest in voting, see, e. g., Burdick v. Takushi, 504 U. S. 428 (1992), but we have never said that it includes the right to vote anonymously. The history of voting in the United States completely undermines that claim.
Initially, the Colonies mostly continued the English traditions of voting by a show of hands or by voice — viva voce voting. Burson, supra, at 200; E. Evans, A History of the Australian Ballot System in the United States 1-6 (1917) (Evans). One scholar described the viva voce system as follows:
“ 'The election judges, who were magistrates, sat upon a bench with their clerks before them. Where practicable, it was customary for the candidates to be present in person, and to occupy a seat at the side of the judges. As the voter appeared, his name was called out in a loud voice. The judges inquired, “John Jones (or Smith), for whom do you vote?” — for governor, or whatever was the office to be filled. He replied by proclaiming the name of his favorite. Then the clerks enrolled the vote, and the judges announced it as enrolled. The representa *225 five of the candidate for whom he voted arose, bowed, and thanked him aloud; and his partisans often applauded.’” Id., at 5 (quoting J. Wise, The End of An Era 55-56 (1899)).
See also R. Dinkin, Voting in Revolutionary America: A Study of Elections in the Original Thirteen States, 1776-1789, p. 101 (1982) (Dinkin).
Although there was variation, the election official would ordinarily compile a poll with the name and residence of each voter, and the name of the candidate for whom he voted. See C. Bishop, History of Elections in the American Colonies 160-164 (1893) (Bishop); R Argersinger, Structure, Process, and Party: Essays in American Political History 47 (1992) (Argersinger). To prevent fraud, the Colonies in Rhode Island, New York, and New Jersey adopted the English rule that “copies of the poll must be delivered on demand to persons who were willing to pay a reasonable charge for the labor of writing them.” Bishop 186. Some Colonies allowed candidates to demand a copy of the poll, ibid., and required the legislature to examine the poll in a contested election, id., at 188-189. Thus, as in this case, the government not only publicly collected identifying information about who voted and for which candidate, it also disclosed that information to the public.
Any suggestion that viva voce voting infringed the accepted understanding of the pre-existing freedom of speech to which the First Amendment’s text refers is refuted by the fact that several state constitutions that required or authorized viva voce voting also explicitly guaranteed the freedom of speech. See, e. g., Ky. Const., Art. X, § 7, Art. VI, § 16 (1799); Ill. Const., Art. VIII, § 22, Art. I, § 28 (1818). Surely one constitutional provision did not render the other invalid.
Of course the practice of viva voce voting was gradually replaced with the paper ballot, which was thought to reduce fraud and undue influence. See Evans 1-6; Dinkin 101-106. There is no indication that the shift resulted from a sudden *226 realization that public voting infringed voters’ freedom of speech, and the manner in which it occurred suggests the contrary. States adopted the paper ballot at different times, and some States changed methods multiple times. New York’s 1777 Constitution, for example, explicitly provided for the State to switch between methods. Art. VI. Kentucky’s 1792 Constitution required paper ballots, Art. Ill, § 2, but its 1799 Constitution required viva voce voting, Art. VI,
§ 16. The different voting methods simply reflected different views about how democracy should function. One scholar described Virginia’s and Kentucky’s steadfast use of viva voce voting through the Civil War as follows: “[I]n the appeal to unflinching manliness at the polls these two states insisted still that every voter should show at the hustings the courage of his personal conviction.” Schouler, Evolution of the American Voter, 2 The American Historical Review 665, 671 (1897). See also id., at 666-667 (“In Virginia and' the other states in close affiliation with her this oral expression was vaunted as the privilege of the free-born voter, to show the faith that was in him by an outspoken announcement of his candidate”).
The new paper ballots did not make voting anonymous. See Evans 10 (“[T]he ballot was not secret”); Argersinger 48 (“Certainly there were no legal provisions to ensure secrecy”). Initially, many States did not regulate the form of the paper ballot. See Evans 10; Argersinger 48-49. Taking advantage of this, political parties began printing ballots with their candidates’ names on them. They used brightly colored paper and other distinctive markings so that the ballots could be recognized from a distance, making the votes public. See Burson, supra, at 200-201; Evans 10-11. Abuse of these unofficial paper ballots was rampant. The polling place had become an “open auction place” where votes could be freely bought or coerced. Burson, supra, at 202. Employers threatened employees. Party workers *227 kept voters from the other party away from the ballot box. Ballot peddlers paid voters and then watched them place the ballot in the box. See L. Fredman, The Australian Ballot: The Story of an American Reform 22-29 (1968); Argersinger 48-50. Thus, although some state courts said that voting by ballot was meant to be more secret than the public act of viva voce voting; and although some state constitutional requirements of ballot voting were held to guarantee ballot secrecy, thus prohibiting the numbering of ballots for voter identification purposes, see Williams v. Stein, 38 Ind. 89 (1871); Brisbin v. Cleary, 26 Minn. 107, 1 N. W. 825 (1879); in general, voting by ballot was by no means secret. Most important of all for present purposes, I am aware of no assertion of ballot secrecy that relied on federal or state constitutional guarantees of freedom of speech.
It was precisely discontent over the nonsecret nature of ballot voting, and the abuses that produced, which led to the States’ adoption of the Australian secret ballot. New York and Massachusetts began that movement in 1888, and almost 90 percent of the States had followed suit by 1896. Burson, 504 U. S., at 203-205. But I am aware of no contention that the Australian system was required by the First Amendment (or the state counterparts). That would have been utterly implausible, since the inhabitants of the Colonies, the States, and the United States had found public voting entirely compatible with “the freedom of speech” for several centuries.
* * . *
The long history of public legislating and voting contradicts plaintiffs’ claim that disclosure of petition signatures having legislative effect violates the First Amendment. As I said in McIntyre, “[w]here the meaning of a constitutional text (such as ‘the freedom of speech’) is unclear, the widespread and long-accepted practices of the American people are the best indication of what fundamental beliefs it was *228 intended to enshrine.” 514 U. S., at 378 (dissenting opinion). Just as the century-old practice of States’ prohibiting anonymous electioneering was sufficient for me to reject the First Amendment claim to anonymity in McIntyre, the many-centuries-old practices of public legislating and voting are sufficient for me to reject plaintiffs’ claim.
Plaintiffs raise concerns that the disclosure of petition signatures may lead to threats and intimidation. Of course nothing prevents the people of Washington from keeping petition signatures secret to avoid that — just as nothing prevented the States from moving to the secret ballot. But there is no constitutional basis for this Court to impose that course upon the States — or to insist (as today’s opinion does) that it can only be avoided by the demonstration of a “sufficiently important governmental interest,” ante, at 196 (internal quotation marks omitted). And it may even be a bad idea to keep petition signatures secret. There are laws against threats and intimidation; and harsh criticism, short of unlawful action, is a price our people have traditionally been willing to pay for self-governance. Requiring people to stand up in public for their political acts fosters civic courage, without which democracy is doomed. For my part, I do not look forward to a society which, thanks to the Supreme Court, campaigns anonymously (McIntyre) and even exercises the direct democracy of initiative and referendum hidden from public scrutiny and protected from the accountability of criticism. This does not resemble the Home of the Brave.

 Plaintiffs seem to disavow reliance on McIntyre v. Ohio Elections Comm’n, 514 U. S. 334 (1995), see Reply Brief for Petitioners 12. Certainly, there are differences between McIntyre and this ease. Mrs. McIntyre was required to disclose her identity herself, by placing her name on her handbill. Here, plaintiffs do not object to signing their names to the referendum petition, where it can presumably be observed by later signers; they challenge only the later disclosure of that information by the State. But both eases are about public disclosure, and both involve a claim to anonymity under the First Amendment. If anything, the line plaintiffs seek to draw — which seeks a sort of partial anonymity— is stranger still.
Justice Stevens quibbles with the shorthand I use, and tries to rein in McIntyre’s holding, by saying that it did not create a “right to speak anonymously,” ante, at 218, n. 4 (opinion concurring in part and concurring in judgment). But McIntyre used the same shorthand. See 514 U. S., at 357 (“[t]he right to remain anonymous”); id., at 342 (“[t]he freedom to publish anonymously”); see also ibid, (“an author’s decision to remain anonymous ... is an aspect of the freedom of speech protected by the First Amendment”).

 The Court notes that “only some petition signing has legal effect.” Ante, at 197, n. 1. That is true. Some petitions may never be submitted to the secretary; they are irrelevant here, since they "will never be subject to the PRA. But some petitions that are submitted to the secretary may lack the requisite number of signatures. Even as to those, the petition signer has exercised his portion of the legislative power when he signs the petition, much like a legislator who casts a losing vote.

 The Court quotes Republican Party of Minn. v. White, 536 U. S. 765, 788 (2002), which stated that a State, “having ‘cho[sen] to tap the energy and the legitimizing power of the democratic process,. .. must accord the participants in that process the First Amendment rights that attach to their roles.’” Ante, at 195. That is correct, but it is not on point. White involved a prohibition on speaking as a condition of running for judicial office. I do not suggest that a State could require legislators (or the citizen-legislators who participate in a referendum) to give up First Amendment rights unconnected with their act of legislating. The electioneering disclosure cases the Court cites, ante, at 196, are likewise not on point, since they involve disclosure requirements applied to political speech, not legislative action.

 The exception for “such Parts as may in their Judgment require Secrecy” was assuredly not designed to permit anonymous voting. It refers to details whose disclosure would threaten an important national inter *223 est. The similar clause in the Articles of Confederation created an exception to the journal requirement for parts of the proceedings “relating to treaties, alliances or military operations, as in [Congress’s] judgment require seeresy.” Art. IX. The Constitution’s requirement is broader, but its object is obviously the same.