R. GUY COLE, Jr., Circuit Judge,
dissenting.
We have before us today a matter of historic proportions. In this appeal, partisan challengers, for the first time since the civil rights era, seek to target precincts that have a majority African-American population, and without any legal standards or restrictions, challenge the voter qualifications of pebple as they stand waiting to exercise their fundamental right to vote.
When the fundamental right to vote without intimidation or undue burden is pitted against the rights of those seeking to prevent voter fraud, we must err on the side of those exercising the franchise. In this case, we need not go so far as to balance these interests in a vacuum, however, because here, the rights of those seeking to prevent voter fraud are already well protected by' the election protocols established by the state: at each polling place, there are election officials, election judges, and ordinary voters who can challenge potential voter fraud.
The movant in this case bears the burden to show why this Court should reverse the well-reasoned decisions by two district court judges, appointed by a Democrat and Republican President respectively. Each judge independently came to the conclusion that a Temporary Restraining Order (“TRO”) against the Challengers was constitutionally required. The Republican Ohio Secretary of State, J. Kenneth Blackwell, has publicly stated that he wants all Challengers banned from the polls on election day. Spencer v. Blackwell, No. C-1-04-738, at 6 (S.D. Ohio Order of Oct. 27, 2004). Now, this Court steps in to overturn the district court, permitting Challengers *553 to go to any polls they wish to target tomorrow. As troubling as the public policy ramifications from this decision are, the legal implications- are equally astonishing.
Judge Ryan’s concurrence asserts that plaintiffs lacked standing at the outset of this case.
In a case where no voter can know that it is he or she who will be injured, such a specific showing is not necessary for standing. Sandusky County Democratic Party v. Blackwell, 387 F.3d 565, 573 (6th Cir.2004). All that is needed is a showing that an injury is likely to occur to some group of voters. This potential injury, necessary for the purposes of standing, as well as for the merits of this case, was shown at the district court level.
The factors which this Court must consider in deciding whether to grant a preliminary injunction have all been met in this case. First, in addressing the chaos and intimidation that will flow from the presence of the partisan Challengers, Judge Rogers states that it is “questionable at best that such a possibility ‘burdens’ the right to vote.” Op. of Rogers, J., at 6. However, such a conclusion simply ignores the applicable standard of review. It is well settled that an appellate court reviews a trial court’s issuance of a TRO, preliminary injunction, or a stay of such injunc-tive relief pending appeal, for an abuse of discretion. Socialist Workers Party v. Att’y Gen. of the United States, 419 U.S. 1314, 1315, 95 S.Ct. 425, 42 L.Ed.2d 627 (1974) (noting that appellate review for “either a stay or the reversal of a preliminary injunction” is for an abuse of discretion); Blue Cross & Blue Shield Mut. of Ohio v. Blue Cross and Blue Shield Assoc., 110 F.3d 318, 322 (6th Cir.1997) (“This court reviews a challenge to the grant or denial of a preliminary injunction under an abuse of discretion standard and accords great deference to the decision of the district court.”); Haman v. J.C. Penney Co., Inc., Nos. 89-5329, 89-5458, 1990 WL 82720, at *6 (6th Cir. July 19, 1990) (“The standard of review that we must apply in reviewing such a stay order is one of abuse of discretion.”); WRIGHT, MILLER, & KANE, FEDERAL PRACTICE AND PROCEDURE § 2904 (2d ed. 2004) (“An application [for a stay of injunction pending appeal] necessarily goes to the discretion of the court.”); see also Seven-Up Co. v. O-So Grape Co., 179 F.Supp. 167, 172 (N.D.Ill.1959) (“And judicial precedent is legion which suggest that the likelihood of successfully urging an abuse of discretion in an appellate court is comparable to the chance which an ice cube would have of retaining its obese proportions while floating in a pot of boiling water.”).
Here, two separate district courts each heard testimony and reviewed evidence to support explicit factual findings that such a procedure may lead to suppression, intimidation, and chaos at the polls. See Spencer v. Blackwell, No. C-1-04-738, at 3-4, 7-8, 12-16 (S.D. Ohio Order of Oct. 27, 2004) (citing statements of election officials and other state officials, testimony of challengers evincing incomplete or confused understanding of proper Ohio election procedures, relevant statistics as to the racial population of the relevant Ohio counties, the lack of guidelines or directions regarding how to deal with challenges, and finding that all this will likely lead to voter intimidation); Summit County Democratic Cent. and Exec. Comm. v. Blackwell, No. 5:04CV2165, at 7, 9-14 (N.D. Ohio Order of October 31, 2004) (reaching similar conclusions). Nonetheless, without the benefit of reviewing any of this testimony or evidence, the lead opinion would reverse the decisions of two trial courts on the grounds that evidence establishes only a “questionable” burden. But our standard of review clearly indicates that in cases where the *554 evidence is “questionable,” we will defer to the reasoned discretion of the district court.
The burden on the right to vote is evident. In this case, we anticipate the arrival of hundreds of Republican lawyers to challenge voter registrations at the polls. Behind them will be hundreds of Democrat lawyers to challenge these Challengers’ challenges. This is a recipe for confusion and chaos. Further, although the district courts did not render their decisions on Equal Protection grounds, Plaintiffs’ evidence on this point is relevant to show the harm that will naturally ensue from the presence of the partisan Challengers. Numerous studies have documented the dramatic effect of poll watchers on African-American voters. See, e.g., Complaint, Spencer v. Blackwell, No. C-1-04-738, at 9-10 (S.D.Ohio).[1] These studies are strong evidence of both an effect and a burden on the voting rights of all voters. “Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized.” Reynolds v. Sims, 377 U.S. 533, 561-62, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) (emphasis added).
The Supreme Court’s decision in Burson v. Freeman, 504 U.S. 191, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992), is also instructive. In that case, the Supreme Court found that allowing vote solicitation near the polls would cause voter intimidation. Id. at 206, 112 S.Ct. 1846. This case is similar. In fact, in this case, voter intimidation is likely to be even greater because the partisan operatives at the polls will be challenging the right to vote itself, rather than merely campaigning for a particular candidate or issue. There is no question that this poses a burden.
Second, the balance of harms is not at all close in this case. The magnitude of burden imposed on voters is great. Although the State of Ohio does have a compelling interest in preventing voter fraud, that interest is served by election officials, election judges, and other voters lawfully at the polling place. Ohio Rev. Code § 3505.20. The statute providing for additional Challengers at the poll is not narrowly tailored to serve this interest, and is not the least restrictive means for doing so. The harm caused by the chaos and uncertainty imposed by hundreds of additional Challengers at the poll far outweighs any minor decrease in voter fraud as a result of the Challengers’ presence. The election judges and other voters perform the same function as these Challengers. The potential harm to the defendants is protected by the political officials at the polls. The potential harm to the plaintiffs, in contrast, is not addressed. The balance of harms, therefore, weighs strongly in favor of denying the motion to stay.
*555 Third, the public interest weighs in favor of allowing registered voters to vote freely. The freedom to vote is best served by allowing election officials, election judges, and citizens to protect against voter fraud. Permitting hundreds of election Challengers to challenge voters at particular polls will promote chaos and uncertainty; it will divert the attention of election judges; and most importantly, it will create a level of voter frustration that could deter citizens from exercising their constitutional right to vote. There is no great justification for this infringement since the interests of the Challengers will be served by other parties. Election Judges represent both parties, with no one party having more than 50% of the judges. Ohio Rev.Code § 3501.22. This requirement alleviates any fear that the appellants have in this case. There is no reason to believe that these election judges, many of whom are members of the same party that insists on sending more lawyers to the polls, will fail to detect voter fraud, especially when it is their job to do so.
The majority indicates that the procedures for partisan political operatives to challenge an Ohio citizen’s right to vote will not result in voter suppression, intimidation, or chaos at the polls. I deeply and sincerely hope they are right.
However, as voting is the very foundation of this Republic, our Constitution requires more than mere hope. Rather, the citizens of Ohio have the right to vote without the threat of suppression, intimidation, or chaos sown by partisan political operatives. I therefore dissent.

. For example, the Complaint notes:
A study published in the 1981 Civil Rights Research Review, reported that in almost half the counties in Georgia, poll watchers intimidated or discriminated against prospective African American voters. A November 11, 1993 report by Associated Press reporter Jim Abrams quoted an anonymous Justice Department Official about post-1988 developments in Los Angeles: "All of these moves are called ballot security moves, moves by plain citizens to keep illegal voters from the polls, but none targeted illegal voters. They all targeted minority voters and specifically threatened them with some dire consequence[s] if there are problems with voter records."
In a 1996 study, David Burnham reported that The Republican National Committee and the New Jersey Republican State Committee engaged in a "concerted effort to threaten and harass black and Hispanic voters” via a "ballot security" effort.